UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| JANE DOE,[1] | |
| Plaintiff, | CASE NO. 6:15-cv-_____ |
| v. | |
| THE FLORIDA STATE UNIVERSITY BOARD OF TRUSTEES, | |
| Defendant. | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### (INJUNCTIVE RELIEF SOUGHT)

Plaintiff, Jane Doe ("Plaintiff"), sues Defendant, The Florida State University Board of Trustees ("Defendant" or "FSU"), and pursuant to Rule 8, Federal Rules of Civil Procedure, alleges:

### Introduction

1.    This is an action involving claims under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688 [hereinafter, "Title IX"], arising out of forcible rape.

---

[1] Consistent with other federal courts' treatment of party names in highly sensitive cases that arise under Title IX of the Education Amendments of 1972 and involve sexual assault, *see, e.g.*, *Doe v. Erskine College*, Case No. 8:04-23001, 2006 WL 1473853 (D.S.C. May 25, 2006), and to protect the privacy, safety, and dignity of Plaintiff and her family, Plaintiff is proceeding anonymously in this pleading.  To date, Plaintiff has been the subject of numerous threats of bodily harm for reporting facts contained in this pleading.  To the extent necessary, Plaintiff will seek appropriate relief from the Court to continue to proceed in this fashion and to otherwise protect her anonymity throughout the instant litigation.

**Parties, Jurisdiction & Venue**

2.      Plaintiff is a citizen of the State of Florida who resides in Pasco County, Florida.

3.      Defendant FSU is a public body corporate within the meaning of FLA. STAT. § 1001.72 and an instrumentality of the State of Florida that is charged by law with the administration of Florida State University, an educational institution and public university of the State of Florida.  Four of FSU's six campuses are located in the U.S. District Court in the Middle District of Florida, including a campus in Orlando, Florida where FSU owns property.

4.      Defendant FSU receives federal funding and financial assistance within the meaning of 20 U.S.C. § 1681(a) and is otherwise subject to Title IX.

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

6.      Venue is proper in the Orlando Division of the U.S. District Court in the Middle District of Florida pursuant to 28 U.S.C. § 1391 because, *inter alia*¸ FSU resides in the Orlando Division in the Middle District, is subject to this Court's personal jurisdiction, and Plaintiff cannot receive a fair and an impartial trial by jury in accordance with the Seventh Amendment to the U.S. Constitution in any other judicial district in which venue would be proper.

7.      Plaintiff has retained the law firms of Hutchinson Black and Cook, LLC and King, Blackwell, Zehnder & Wermuth, P.A., and has agreed to pay same their reasonable attorneys' fees to represent Plaintiff in this action.

8.      All conditions precedent to the maintenance of this suit and Plaintiff's claims have occurred, been performed or otherwise waived.

**General Allegations**

**SUMMARY**

9.      On December 7, 2012, Plaintiff, an FSU freshman, was taken to the residence of another FSU freshman student and raped.  Immediately after the rape, Plaintiff sought help from her friends and one friend called the police.  FSU Police responded and interviewed her and she described being sexually assaulted by an unknown male at an apartment building.  Plaintiff was transported to Tallahassee Memorial Hospital where she was examined and treated for vaginal trauma and other injuries.  A rape kit and Sexual Assault Nurse Examination ("S.A.N.E.") were performed.  An FSU victim advocate joined her at the hospital.  Plaintiff was at that time unable to identify her assailant and the matter was turned over to the Tallahassee Police Department (the "Tallahassee Police").

10.     On January 10, 2013, as the spring semester began, Plaintiff recognized her assailant on the first day of a class in which they were both enrolled.  Plaintiff listened for his name during roll call and promptly provided it to the Tallahassee Police: Jameis Winston ("Winston").

11.     Unbeknownst to Plaintiff at the time, Winston was FSU's premier freshman football recruit.  Although he was not yet playing football during his "redshirt" freshman year, the football program expected Winston to start as quarterback in the fall of 2013.

12.     On January 22, 2013, the FSU Athletics Department was in contact with the Tallahassee Police and learned that Winston had been identified as the suspect in a violent

sexual assault.  The FSU Athletics Department called meetings involving high-ranking FSU Athletics Department and football officials, Winston, and Winston's lawyer.  On information and belief, head football coach James "Jimbo" Fisher ("Fisher") and Senior Associate Athletics Director Frances "Monk" Bonasorte ("Bonasorte") became aware of the rape accusations against Winston at that time.  The FSU Athletics Department chose to violate school policy and not report to the FSU administration that their star recruit had been identified as the suspect in the December 7, 2012 rape investigation. This deliberate concealment of student-on-student sexual harassment to protect the football program deprived Plaintiff of her rights under Title IX and caused substantial damages, as detailed further below.

13.     For the next eleven months, FSU did nothing to investigate Plaintiff's report of rape while the FSU Athletics Department continued to keep the incident a secret.  Despite Plaintiff's report to the FSU Police and the FSU Athletics Department's knowledge of the suspect's identity, no one at FSU conducted any investigation into the matter.  Winston, meanwhile, was named starting quarterback of the football team and, in the fall of 2013, led FSU in the pursuit of a national championship.

14.     On October 25, 2013, Plaintiff's victim advocate informed her that a second woman had come forward and reported being raped by Winston.  The advocate asked if Plaintiff would cooperate with and participate in disciplinary proceedings against Winston. Plaintiff stated that she absolutely would do so.

15.     On November 8, 2013, the Tallahassee Police received an inquiry from the Tampa Bay Times about a reported investigation into the now star quarterback.  Tallahassee

Police immediately notified FSU Police Chief David Perry ("Chief Perry") about the inquiry and sent Chief Perry the police reports at Perry's request. Chief Perry forwarded those police reports on to Bonasorte that same night and Bonasorte then notified Fisher.

16. Shortly thereafter, Winston's lawyer, R. Timothy Jansen ("Jansen"), also received a copy of those reports. When questioned about where he received a copy of the unreleased reports, Jansen said that "he got them from a guy in town" who, on information and belief, was a member of the FSU Athletics Department.

17. Late on November 12, 2013, Tallahassee Police Detective Scott Angulo ("Detective Angulo") notified the State Attorney's Office about the investigation for the first time.

18. The following morning, Jansen provided the State Attorney's Office with newly sworn and nearly identical affidavits from two of Winston's football teammates. The affidavits, executed in Jansen's office, claimed to be eyewitness accounts in support of Winston.

19. Despite being on notice that two women had reported being raped by Winston, on November 12, 2013, FSU Dean of Students Jeanine Ward-Roof ("Ward-Roof"), who supervised Code of Conduct proceedings at FSU, emailed Chief Perry and others at FSU stating that no disciplinary proceedings against Winston were going to take place.

20. Soon thereafter, the rape investigation against Winston was leaked and reported to the media. Winston had by then become a national college football celebrity, and FSU appeared to be on course for a national championship.

21.     In the wake of an ensuing media frenzy, Plaintiff was relentlessly vilified and threatened on the Internet and in FSU football-friendly quarters, and her and her family's personal and work addresses were published on the Internet, along with false slurs on Plaintiff's character and threats on her life.

22.     Fearing for her safety, Plaintiff left FSU's campus on November 14, 2013. Still, FSU made no investigation into its starting quarterback.

23.     Shortly after winning the 2014 BCS National Championship game, FSU inquired of Winston about the rape accusation for the first time.  Winston refused to answer any questions and FSU again let the matter drop.

24.     Following months of persistence by Plaintiff, FSU finally conducted an investigation that consisted of interviewing Plaintiff and her parents and making another interview request to Winston, who again refused to answer any questions.  No other witnesses were contacted.

25.     At the conclusion of this minimal and now compromised investigation, an FSU Code of Conduct hearing was finally held in December 2014, but the hearing officer found that insufficient evidence existed, leaving Winston undisciplined.

26.     The FSU football team continued their undefeated season, playing in the first ever college football playoffs for the 2015 National Championship with Winston as starting quarterback.

27.     Although Plaintiff wishes to remain an FSU student, for personal safety reasons she cannot attend classes at or otherwise be on FSU's Tallahassee campus, thus

being denied the benefits and opportunities of the higher education to which she had embarked.

## THE RAPE

### *Plaintiff is Taken to Unknown Location from Potbelly's Bar*

28.     In the fall of 2012, Plaintiff was a freshman at FSU at its Tallahassee campus. She had dreamed of attending FSU for many years and was excited to see that dream come true.  She pledged a sorority which she loved and was very much enjoying being a new student at her chosen school.

29.     On the evening of December 6, 2012, Plaintiff went to Potbelly's, a local bar near campus, with two friends.  A loud crowd of hundreds of FSU students milled around several dance and drinking areas.

30.     Unbeknownst to Plaintiff, in the crowd was another FSU freshman named Jameis Winston from Bessemer, Alabama, who had been recruited to play football for FSU. As of December 2012, Winston had not yet played college football and was not well known.

31.     Plaintiff and her friends socialized, danced and consumed alcoholic beverages that her friend Marcus purchased.

32.     As Plaintiff passed one of the bars, a man she did not know – who appears to have been Winston – offered Plaintiff a shot of an unknown liquor, which she consumed. Sometime later, Plaintiff found herself on the sidewalk in front of Potbelly's separated from her friends in the presence of men she did not know.  She texted her friend Monique "[c]ome find me," because she was growing increasingly uncomfortable and afraid.

33.     The men hailed a taxicab and Plaintiff was led inside.

34.     Plaintiff had no idea where the cab was going, who the men were, or what they planned to do.  The man seated next to her, later identified as Winston, kept touching and fondling Plaintiff.  Plaintiff rejected his advances and became increasingly panicked. She called her friend Monique twice for help but she did not answer.

### Plaintiff is Raped in Off-Campus Student Housing for Football Players

35.     After the cab stopped, Plaintiff was taken by the arm and led into the Legacy Suites Apartments by the man who had been fondling her – Winston.

36.     The Legacy Suites is located two blocks from the FSU campus and then housed the majority of the FSU football team.  The football team now lives in on-campus housing that is owned and managed by the same company that owns the Legacy Suites.  But in 2012, FSU placed football players in the Legacy Suites through its off-campus housing service and FSU housing website.

37.     While living in the Legacy Suites, Winston's rent was paid for through his FSU football scholarship.

38.     Winston took Plaintiff into a first floor apartment and directly into his bedroom.  He then stripped Plaintiff of her clothes, pushed her on his bed, and began forcefully raping Plaintiff in her vagina.

39.     Plaintiff lay frozen with fear.  She said "no, no" and "please stop" over and over but Winston continued to rape her.

40.     The other two men, who would later be identified as FSU football teammates Chris Casher ("Casher") and Ronald Darby ("Darby"), initially remained outside Winston's unlocked bedroom.

41.     After the assault began, however, as Plaintiff would later learn, Casher stepped into the room and began filming the rape on his cellphone.  Casher wanted to "join in" the assault of Plaintiff.

42.     But Darby entered the room and told Winston, "Dude, she is telling you to stop."  For a brief moment, Plaintiff thought her nightmare might be over.  Instead, Winston picked her up in a fireman's carry, walked her into a bathroom, deposited her on the hard floor and locked the door.

43.     In the bathroom, Winston resumed raping Plaintiff.  She resisted, repeatedly telling him "no" and "stop," and tried to fight him off.  But Winston grabbed her arm and leg, pinning her hard against the floor, and continued to thrust.  To stop her protests and block her view of him, Winston covered Plaintiff's face with a hand and jammed her head to the side as the thrusts continued.

44.     Plaintiff continued to try to push and kick Winston off but he was much too strong.  Eventually the assault ended.  Winston picked Plaintiff up from the bathroom floor and carried her back to the bed where she lay in shock, unable to dress herself.   Winston put her clothes on and told her to leave but she did not know where she was.

45.     Winston, apparently realizing that Plaintiff did not know where she was, took Plaintiff out of his apartment, put her on his scooter and asked Plaintiff where she lived. Plaintiff gave him a false address.  As Winston drove her there, Plaintiff sat behind, forced to hold on and horrified by having to grasp the body of the man who had just raped her. Winston left Plaintiff at an intersection and disappeared around a corner.

### *Plaintiff Cries for Help over Social Media and is Taken to the Hospital*

46. Plaintiff stood overcome by trauma and sobbing in the street. She did not know who to call for help but she knew that if she sent a Tweet, multiple close friends would see it and someone would respond. She tweeted, "SOMEONE HELP ME."

47. Plaintiff's high school friend Bria Henry ("Bria") called almost immediately, at 2:48 a.m. on December 7, 2012, while Plaintiff was still alone in the street. Plaintiff was crying uncontrollably and Bria had to ask three times what happened to understand that Plaintiff had been raped. Bria said Plaintiff needed to call her parents right away and Plaintiff began walking the short distance to her dorm.

48. Right after speaking with Bria, Plaintiff's friend Jenna Weisberg ("Jenna") called her. Jenna said she was coming right over to Plaintiff's dorm. She kept talking with Plaintiff the entire way as she drove, giving reassurances block by block that she would soon be there. Upon arrival, Jenna found Plaintiff still crying uncontrollably. Jenna called the police at 3:22 a.m. and reported that her friend had just been raped by an unknown assailant. FSU Police responded six minutes later.

49. Before FSU Police Officer Dinorah Harris ("FSU Officer Harris") arrived, Plaintiff got a phone call from her mother. Bria had contacted her former high school cheerleading coach who had called Plaintiff's parents. Plaintiff, still crying, told her mother and father what had happened that night. They said they were leaving immediately and would be there in four hours or less.

50.     Meanwhile, FSU Officer Harris arrived and interviewed Plaintiff, who began to provide detailed information about the incident.  At the time, however, Plaintiff did not know the identity of her assailant.

51.     FSU Officer Harris transported Plaintiff to Tallahassee Memorial Hospital for a Sexual Assault Nurse Examination ("S.A.N.E."). The criminal case investigation was turned over to the Tallahassee Police, who interviewed Plaintiff twice that day.  Tallahassee Police Officer Clayton Fallis noted that during his interview – roughly two hours after the rape – "[s]everal bruises began to appear on the victim."

52.     After December 7, 2012, FSU Police made no further effort to investigate Plaintiff's rape.

53.     At the hospital, Plaintiff was met by FSU victim advocate Sarah Groff at 4:09 a.m.  They were soon joined by rape crisis victim's advocate Angela Chatfield ("Chatfield"). Chatfield noted that based on her experience and training, Plaintiff appeared to be in a dissociated state and was traumatized.

54.     The hospital findings included bruises on Plaintiff's arm and legs.  The pelvic exam confirmed vaginal tenderness and redness.   The sexual assault information sheet accompanying Plaintiff's hospital chart states, "[U]nknown PERP[.]  States held down by arms + legs.  Now [with] generalized muscle aches and vaginal tenderness.  Now [with] H[eadache] and nausea. . . ."  The hospital chart further recorded that Plaintiff was "[s]aying no and resisting. . . .  Hi[gh] severity and urgent."

## FSU's FAILURE TO COMPLY WITH TITLE IX

### *Tallahassee Police Refuse to Investigate Winston, FSU Still Fails to Respond to the Report Made to FSUPD, and Plaintiff Struggles With a Hostile Educational Environment*

55.     Just over one month after she was raped, at the start of the next semester, on January 10, 2013, Plaintiff appeared for the first day of a course entitled "Race and Ethnicity."  Sitting in the front of the room, Plaintiff turned around to look for a friend and was shocked to see her attacker in the classroom.  She listened until his name was called during the roll call and wrote it down.

56.     Plaintiff then had the realization that her attacker was to a certainty also an FSU freshman student.  She might encounter him not just in this class but at anytime and anywhere on campus throughout her college career.  She realized that his two associates were probably also FSU freshman and could also run into and recognize her.

57.     Shortly after class, Plaintiff called and left a voice message for Detective Angulo at the Tallahassee Police in which she identified her assailant:  "His name is Jameis Winston."  The name meant nothing to her at the time.

58.     On January 11, 2013, the day after Plaintiff confirmed to Detective Angulo the identity of her assailant as Winston, Detective Angulo spoke with Plaintiff's family representative, Patricia Carroll ("Carroll").  Now that Plaintiff had identified Winston, Carroll insisted that a DNA swab be obtained from Winston to confirm the identification.

59.     Detective Angulo refused, because he believed that could cause the investigation to "go public."  Detective Angulo explained to Carroll that Tallahassee was a big football town and that if Plaintiff pressed charges she would be raked over the coals and that football fans would make her life miserable.  Detective Angulo advised Carroll that he

would not require DNA samples and that Plaintiff should think twice before proceeding. Carroll responded that Plaintiff and her family expected the investigation to go forward and that she should be kept informed.

60.     Detective Angulo confirmed what Plaintiff had learned through Google and social media the night before: Winston was a top football recruit sitting out his freshman year at FSU as a "redshirt" but was expected to start as quarterback in the coming season. Plaintiff's fear intensified because she understood how powerful football was at FSU.  She scheduled a meeting for January 17, 2013 with Kori Pruett ("Pruett"), the FSU Victim Advocate who was assigned to provide emotional and academic support to Plaintiff in the wake of her sexual assault.

61.     The purpose of the January 17, 2013 meeting was to discuss what to do now that Plaintiff had identified her perpetrator as a football player at FSU who was in one of her classes.  Plaintiff and Pruett talked about whether Plaintiff should withdraw from FSU for the semester and, if not, whether to drop the class – something Plaintiff was reluctant to do as it would have delayed her graduation.  They discussed the criminal investigation of Winston and Pruett said that FSU had a disciplinary process through the Office of Student Rights and Responsibilities ("SRR"), but Pruett did not say whether the process would be employed.

62.     Plaintiff told Pruett she would see whether she could handle staying in school and whether Winston would continue to attend her race and ethnicity class.  Nobody at FSU ever informed Plaintiff that Winston could be required to drop the class or that any other accommodation or protection could be put in place to help her.

63.     Without any additional information or other alternatives from FSU, Plaintiff believed that the only alternative to staying in her classes, fearful every day of her attacker, was dropping out of college – something she was determined not to do.  Plaintiff continued going to classes but stopped going out at night for the rest of the 2013 spring semester.  She did not go to any parties or bars and did not go out on dates.  She was constantly on guard and afraid that her attacker might reappear at any time.

64.     On February 7, 2013, three weeks after initially meeting with Pruett, Plaintiff and Pruett met again.  Plaintiff said that, to her relief, Winston had not shown up in her race and ethnicity class since the mandatory first day of class on January 10, 2013, but that she was still terrified of seeing him again and had been struggling with some of her course work.  She told Pruett that the police investigators were waiting for toxicology results.  Again, nothing was offered by anyone at FSU to protect Plaintiff, ensure her safety or minimize her worries of running into her assailant.

65.     At the midterm exam in her race and ethnicity class, Plaintiff was frightened by seeing Winston appear for the exam.  But with only a few weeks left in the semester, Plaintiff decided to stick it out then return home in May 2013.

66.     No one from FSU's administration or Title IX office ever contacted Plaintiff during either the spring 2013 semester of Plaintiff's freshman year or the fall 2013 semester of Plaintiff's sophomore year regarding disciplinary proceedings, investigation of the rape, protection of Plaintiff from Winston, removing him from her courses, restraining his proximity to her, or possibly removing him from school altogether.

67.     FSU knew that its confidential Victim Advocate Program was not a substitute for its obligations under Title IX.  FSU knew that it had duties to investigate, accommodate and protect sexual assault victims such as Plaintiff and to investigate and sanction those responsible in a manner that addressed the harassment and prevented its recurrence.

68.     Indeed, FSU told students like Plaintiff:

*Welcome to the Victim Advocate Program!*

**If you or someone you care about has been the victim of a crime…**
… you may need to talk with someone about your options.  It is not uncommon to experience a broad range of emotions including [sic] fear, confusion, anger, guilt, frustration, and tremendous sense of loss.  These are all *NORMAL* reactions to what has happened.

**You do not have to go through this alone…**
 A confidential advocate is on call twenty-four hours a day to respond to FSU students, faculty, and staff who are victimized, or any other person who is victimized on our campus, or by an FSU student.

Services offered include emotional support, instructor notification, referrals, and educational programming for our campus community.

**Confidential support is available…**
Federal law (Title IX of the Education Amendments of 1972) requires FSU to ensure an educational environment free from sex discrimination, sexual harassment, and sexual violence.  **If an employee at FSU becomes aware of an incident, he or she MUST report to the Title IX Coordinator.**  The Victim Advocate Program is confidential and is exempt from this reporting but can help you file a report if you choose.

FLORIDA STATE UNIVERSITY, Victim Advocate Program, http://victimadvocate.fsu.edu (last visited January 6, 2015) (ellipses in original) (final emphasis in bold added).

69.     Despite FSU Police being on notice within an hour of the rape on December 7, 2012 and the FSU Athletics Department's awareness of the rape in January 2013, the incident was never reported by either of those departments to FSU's Title IX Coordinator.

### The FSU Athletics Department Learns of the Sexual Assault and Conceals it from the School Administration

70.     FSU, in concert with the Tallahassee Police, took steps to ensure that Winston's rape of Plaintiff would not be investigated by either the university or law enforcement.

71.     Tallahassee Police Investigator Paul Osborn called Winston on January 22, 2013, 11 days after Plaintiff's identification of him as her rapist, to request that Winston come by for an interview.

72.     Investigator Osborn then called Bonasorte and told him that Winston was suspected in a rape investigation.

73.     At 5:02 p.m. on January 22, 2013, Bonasorte initiated the first of two consecutive phone calls with someone at a cellular phone number registered to a "Candice Fisher," the wife of head football coach Jimbo Fisher.  Shortly after speaking with the individual using Candice Fisher's phone, Bonasorte called Tallahassee criminal defense attorney Timothy Jansen.

74.     In roughly one hour following his first phone call to Candice Fisher's phone, Bonasorte talked back and forth with "Candice Fisher" and Jansen seven different times.

75.     The following day, on January 23, 2013, Winston refused to appear for his scheduled interview.  Instead, Jansen came in his place.  Bonasorte spoke with attorney Jansen at least three additional times that day and then followed up with two more phone calls to "Candice Fisher" the following day.

76.     In 2013, Bonasorte was FSU's Senior Associate Athletics Director ("SAAD"), the second in charge of FSU's Athletics Department and the individual who oversaw FSU's football program together with Fisher, FSU's head football coach.  Along with FSU campus police officials, Bonasorte and Fisher were for Title IX purposes appropriate persons with authority to take corrective action, given FSU's duty to report sexual harassment and control over students on the football team.

77.     Through, *inter alia*, the initial call to FSU Police and their December 7, 2012 response and investigation, FSU had actual knowledge of Plaintiff's rape within one hour of its occurrence.

78.     Senior FSU Athletics Department and officials had actual knowledge that Plaintiff reported being raped by Winston as of no later than January 22, 2013, six weeks after the rape.

79.     FSU's duties to respond to and investigate the reported rape, mitigate its impact on Plaintiff and protect her safety, and eliminate the ongoing effect of the assault were triggered upon Plaintiff's December 7, 2012 report to FSU Police and yet again by the January 22, 2013 Tallahassee Police notification to the FSU Athletics Department.

80.     Yet in January 2013, officials in the FSU Athletics Department and the FSU football program chose to conceal the allegations of rape against their prize recruit from

the rest of the university and specifically from the Title IX Coordinator and SRR Office in deliberate violation of their duties under Title IX.

81.     FSU Athletics Department and football officials were also on notice of their duties to report and refer the rape accusations against Winston to appropriate university officials based on the FSU Policy on Sexual Misconduct and other FSU policies requiring all FSU employees to report student-on-student sexual misconduct to the Dean of Students Department.

82.     As the FSU Victim Advocate Program website information for students correctly states: "If an employee at FSU becomes aware of [a sexual assault], he or she MUST report to the Title IX coordinator."  (Emphasis in original).  Moreover, FSU knew from the April 4, 2011 "Dear Colleague Letter" it received from the Office of Civil Rights of the U.S. Department of Education [hereinafter, the "DCL"] that, as soon as it learns of a student-on-student rape, FSU must take immediate action to eliminate the sexual assault risk, prevent its recurrence, and address its effects.  Regardless of whether a student victim reports a rape or files a complaint, and regardless of the existence of a law enforcement investigation, FSU must, according to the DCL, promptly investigate as soon as the school, through its police department or any appropriate official, learns of a student's rape.  Under the DCL, FSU's SRR Office and/or Title IX Coordinator were under duties to contact and inform Plaintiff of its investigation.  Under the DCL, FSU was under a duty to take immediate steps to protect Plaintiff to ensure her safety and well-being, including taking interim steps while an investigation was pending, such as prohibiting Winston from having any contact or classes with Plaintiff.  The DCL specifically put FSU on notice that it should

not remove a victim such as Plaintiff from classes while allowing an accused student to remain but instead should be sure that Winston and Plaintiff did not attend the same classes.

83.    FSU knew it was under legal duties to act immediately in response to Plaintiff's rape as soon as any appropriate persons at FSU with authority to take corrective action had actual knowledge that Plaintiff's rape had been reported.  In 2003, FSU previously dealt with a similar Title IX crisis involving protecting a football player from being subjected to a rape inquiry.  Indeed, the FSU Inspector General's report dated August 24, 2003 detailed a nearly identical cover-up of rape accusations against FSU football player Travis Johnson by FSU's then Athletics Director and SAAD, and concluded that the FSU Athletics Department violated Title IX and FSU's own policies by not reporting an allegation against a football player to the appropriate administrative office.

84.    Despite clear notice of FSU's ongoing duties under Title IX, in August 2013, nine months after Plaintiff's report to the police, Fisher named Winston FSU's starting quarterback.  At the time that Winston was named the starter, the FSU Athletics Department knew that they were committing gross violations of Title IX by hiding the report from the administration.

*A Second Winston Victim Comes Forward and Plaintiff Agrees to Testify at a Disciplinary Hearing Against Winston*

85.    In the months following the identification of Plaintiff's assailant, no one on behalf of FSU, with the lone exception of Plaintiff's confidential victim advocate, ever mentioned to Plaintiff that the school could bring disciplinary charges against Winston.

Plaintiff's only information was gained through brief, privileged victim-advocate conversations in which Pruett gave Plaintiff an overview of the SRR process.

86.     Plaintiff never heard from FSU's Title IX office about the possibility of charges or an investigation as that office was presumably still unaware that a rape had even been reported against Winston.

87.     In August 2013, Plaintiff returned to the Tallahassee FSU campus for her sophomore year with trepidation.  Football season had begun and everywhere she went she could not escape hearing the name "Jameis Winston" excitedly uttered.  Winston had gone from being unknown at FSU to being "Famous Jameis."  He began leading FSU to huge victories with ecstatic press coverage and fan support.

88.      Plaintiff met with Pruett for one hour on October 25, 2013 to discuss the exacerbation of her fear and difficulties being on campus during football season as her rapist received the adulation of a hero.  Pruett and Plaintiff "devised a plan" for Plaintiff to attend the next home game as a test of whether she was up to it.  They made a follow-up counseling center appointment for Plaintiff on November 4, 2013, two days after the game.

89.     Plaintiff remained unable to go out at night because of her fear of Winston. Pruett suggested safe groups Plaintiff could join but no measures to protect her from Winston and his followers.

90.     At the same meeting on October 25, 2013, Pruett also informed Plaintiff that a second female student had reported that Winston sexually assaulted her.  With a mix of sympathy, terror, and even guilt that Winston was still free to harm others, Plaintiff began to

cry.  Pruett asked Plaintiff if she would testify against Winston if the school brought Code of Conduct charges against him and Plaintiff said she would.

91.    A week later, on November 2, 2013, Plaintiff attempted to attend the FSU football game with friends.  With Winston quarterbacking, Plaintiff was able to stay only about one quarter until, overrun with anxiety, she had to leave FSU's Doak Campbell Stadium.

### The Tampa Bay Times Receives a Tip and FSU Officials Hinder the Criminal Investigation and SRR Disciplinary Proceedings

92.    On November 8, 2013, acting on a tip, sports journalist Matt Baker ("Baker") from the *Tampa Bay Times* contacted the Tallahassee Police about allegations of sexual assault against Winston and asked for a copy of the reports.

93.    As of the date of Baker's media request, the FSU football team under Winston had a 9-0 record and a number two ranking in the nation, and Winston was the leading candidate to win the Heisman trophy.

94.    Instead of sending the reports to Baker, the Tallahassee Police instructed its records chief, Michael Courtemanche ("Courtemanche"), to send the records to FSU – specifically to FSU Police Chief Perry – despite the absence of any law enforcement purpose for doing so.

95.    Chief Perry received the Winston reports with an email about Baker at 3:41 p.m. on Friday, November 8, 2013.  Chief Perry asked Courtemanche for Baker's background.

96.     At 8:53 p.m. that day, Chief Perry forwarded the investigation reports and information about Baker to Bonasorte.

97.     The next morning, Saturday, November 9, 2013, more emails were sent from the Tallahassee Police to FSU Police Chief Perry and forwarded to Bonasorte in the FSU Athletics Department.  Bonasorte asked his Sports Information Director to research Baker's background.

98.     At 11:34 a.m. that Saturday, Bonasorte emailed Chief Perry "I will talk to Jimbo," referring to head FSU football coach James "Jimbo" Fisher.

99.     Shortly thereafter, those same police reports provided to Bonasorte were provided to Winston's criminal defense lawyer, Jansen.

100.    Jansen used his head-start on the State Attorney's Office to coordinate Winston's teammates – Casher and Darby – as eye witnesses before prosecutors even learned there was an investigation.

101.    Chief Perry also told Jeanine Ward-Roof, the FSU Dean of Students who supervised the Title IX Coordinator, the SRR Office and the Victim Advocate Program, what was going on.  Ward-Roof informed Chief Perry in an email at 1:16 p.m. on November 12, 2013 about the second student accusing Winston of sexual assault and assured Chief Perry that an SRR Code of Conduct proceeding against Winston for raping Plaintiff would not move forward.

102.    Thus, as of November 12, 2013, the FSU Administration had shut down any investigation into either of the reports of sexual assault against Winston.

103.    Only after the FSU Police, FSU Athletics Department, FSU Administration, and Jansen had received their copies of the police reports did Tallahassee Police Sgt. Joanna Baldwin authorize the release of the Winston file to the State Attorney's Office, which occurred at 3:30 p.m. on November 12, 2013.

104.    State Attorney William "Willie" Meggs ("Meggs") was notified of the Winston case on November 13, 2013, five days after FSU officials had possession of the full police reports.

105.    Also on November 13, 2013, Casher and Darby signed nearly identical affidavits prepared by Winston's attorney's office in which they claimed to have seen a portion of the sexual encounter between Plaintiff and Winston that they said looked consensual.

106.    "Jansen knew more about the so-called investigation than we did," Meggs said, observing that it "handicapped" his investigation.  *See* Kevin Vaughan, *Documents: Police, FSU hampered Jameis Winston Investigation*, FOX SPORTS (Oct. 10, 2014), http://www.foxsports.com/college-football/story/jameis-winston-florida-state-tallahassee-police-hindered-investigation-documents-101014.  Meggs later considered serving a search warrant on Jansen to determine how he got the reports.  It was wrong, Meggs said, to have shared the police reports with FSU athletics officials and for them to give the reports to Jansen.  "Then he starts preparing a defense before we even know there's a case." *Id.*

107.    On the same day that Meggs was notified of the Winston case, Plaintiff's family representative Carroll received a call from Jansen saying that he represented Winston.  Carroll, confused about how Jansen got her name and number, questioned him about the

source of his information.  Jansen admitted to having the police reports, saying he got them "from a guy in town."

108.    At 3:07 p.m. PST on November 13, 2013, the website TMZ.com reported that Winston was being investigated for sexually assaulting Plaintiff, triggering significant national media attention.

109.    Tallahassee Police detectives went to FSU on November 14, 2013 to interview Casher and Darby.  They were met by Bonasorte, who directed them to his office.  Bonasorte did not permit the detectives to contact Casher or Darby until after he had called attorneys for the athletes.

110.    The next day, the FSU Administration held a meeting to discuss Winston and public relations.  The following individuals attended the meeting: FSU Vice President Mary Coburn (the individual to whom Ward-Roof reported); Chief Perry; Vice President Coburn's husband, David Coburn (not an FSU official but the college roommate of then FSU President Barron); FSU's  counsel, Carolyn Egan ("FSU counsel Egan"); FSU media and PR personnel; and Bonasorte.

111.    On November 25, 2013, for the first time since Plaintiff's rape almost one year earlier, and only after a 12-day ongoing media firestorm about the Winston rape allegations, a meeting "to discuss case" was convened under the auspices of the office of Dean Ward-Roof.  FSU counsel Egan and FSU associate general counsel Robyn Jackson ("Jackson") attended.  A note from the meeting reads, "Until this point we were not aware of case."

***Plaintiff Drops Out of FSU Due to Safety Concerns and Death Threats***

112.    In the days and weeks after November 13, 2013, Tallahassee was inundated with massive media coverage.  Plaintiff received threats on her life on various social media outlets.  Her sorority received a threat to burn their house down.  The tires on a car belonging to a sorority sister were slashed; and other sorority sisters were targeted and threatened.  Personal information about Plaintiff was leaked and spread across the Internet.  False and defamatory attacks, including Photoshopped photos of Plaintiff, appeared.  She was called a slut, whore, cleatchaser, and other obscenities not worthy of reproduction here.  Her parents' and brother's phone numbers and addresses were broadcast.  The dread and foreboding she had felt all year at FSU came to an explosive head.

113.    On November 13, 2013, Plaintiff's mother came to FSU in Tallahassee to bring her daughter home the next day.  Plaintiff would never be able to attend classes there again.  Her dream college education was permanently lost.

***After Winston Wins the Heisman Trophy and FSU Wins the National Football Championship, FSU Finally Starts a Title IX Investigation***

114.    On December 5, 2013, Meggs announced that Winston could not be charged with Plaintiff's rape due, in no small part, to the poor police work of the Tallahassee Police.

115.    On December 14, 2013, Winston was named winner of the 2013 Heisman Trophy.  He was escorted by Fisher to the ceremonies in New York City to receive his trophy.

116.    On December 19, 2013, FSU Victim Advocate Director Melissa Ashton confirmed to Carroll that, during the fall 2013 semester, Plaintiff had indeed wanted the Title IX investigation and SRR proceedings against Winston to move forward.

117.    On January 6, 2014, FSU's football team won the BCS National Championship.  Winston was named the game's co-most valuable player.

118.    On January 14, 2014, after FSU had won the national championship, a second meeting was convened under the auspices of the office of Dean Ward-Roof and SRR.  The Tallahassee Police file was reviewed for the first time and a conversation with Winston was conducted.

119.    On January 23, 2014, FSU finally called Winston in for an interview in connection with a Title IX investigation into Plaintiff's rape.  Winston's representative was Bonasorte.

120.    At his January 23, 2014 investigative interview, Winston refused to answer any questions about the rape allegations.  FSU then concluded its Title IX investigation on the spurious ground that Winston refused to talk.

121.    Two weeks after he refused to answer whether he raped Plaintiff, Winston – along with accomplice Casher – posted a video on Instagram of Winston dancing and singing these words celebrating rape:

> *She said she wants to take it slow,*
> *I'm not that kind of a guy I'll let cha know,*
> *When I see that red light all I know is go.*

*See*, *e.g.*, Mike McIntire & Walt Bogdanich, *At Florida State, Football Clouds Justice*, N.Y. TIMES, Oct. 10, 2014, http://www.nytimes.com/2014/10/12/us/florida-state-football-casts-shadow-over-tallahassee-justice.html?_r=0.

122.    On February 21, 2014, Plaintiff's counsel wrote to FSU counsel Egan in response to her inquiry about Plaintiff's cooperation.   In that letter, counsel for Plaintiff emphasized that, because of FSU's one-year delay in responding to Plaintiff's sexual assault, there were significant fears for her safety on campus.   Nonetheless, Plaintiff's counsel informed FSU that "[Plaintiff] remains willing to cooperate and is open to hearing the school's thoughts as to what response the school believes would address the harassment and allow her to re-enroll in classes at Florida State."

123.    FSU counsel Egan responded on March 15, 2014, stating that the only communication with Plaintiff from the school was through the confidential victim advocate and that that advocate could not re-disclose those communications to the administration, thereby acknowledging that no one else at FSU ever attempted to contact Plaintiff.

124.    On March 25, 2014, Plaintiff's counsel again wrote to FSU confirming Plaintiff's willingness to cooperate, stating: "As you are aware, FSU's obligations under Title IX belong to the school and are not a burden to be placed on a rape victim.  [Plaintiff] will provide further information as needed for any Title IX complaint process the school initiates but will wait, as she has for fifteen months, for the school to act in compliance with [its] obligations."

125.    On March 31, 2014, FSU counsel Egan acknowledged Plaintiff's willingness to cooperate with FSU's Code of Conduct process and disclosed that FSU had charged Casher and Darby with various violations for their role in the events of December 7, 2012. However, FSU still would not investigate Winston because he would not talk.

126.     On April 1, 2014, Plaintiff's counsel wrote to FSU counsel Egan: "What is conspicuously missing though is disciplinary charges against Mr. Winston. . . . [M]y client has repeatedly expressed her willingness to cooperate with the University."

127.     In the spring of 2014, FSU, in violation of the victim advocate privilege, produced a copy of Plaintiff's privileged victim advocate file to its outside counsel, for potential civil claims arising from FSU's Title IX violations.

128.     On May 20, 2014, while in attendance at FSU for the hearings against Casher and Darby, FSU's associate general counsel Jackson invited Plaintiff to provide a full statement then and there about Winston's conduct.  Plaintiff consulted with her counsel, who called Jackson and agreed to provide a statement.  Jackson, however, said her thirty-minutes-old offer had expired and that the "window had closed."

129.     Eventually, a Title IX interview of Plaintiff was held on August 6, 2014.  She recounted for the fifth time in yet another formal interview the details of being raped by Winston.

130.     On information and belief, Winston again refused to be interviewed.

131.     On September 16, 2014, Winston mounted a table at the FSU Student Union and repeatedly yelled "F*** her right in the p***y!" to hundreds of FSU students.  For this sexually offensive conduct, Fisher suspended Winston from play for one half of the game on September 20, 2014.  After a national outcry, then FSU President Garnett Stokes extended the suspension to the entire game, but allowed Winston to rally his teammates from the sidelines.

132.    FSU's tolerance of Winston's obscene rants insulting women and the resulting wrist-slap sanction he received are but a small part of the sexually hostile environment that Plaintiff endured and ultimately drove her from campus.

133.    Two months after Plaintiff's interview, in October 2014, FSU announced that an SRR Code of Conduct hearing would be held, despite the fact that Winston was not actually being charged with any offenses under FSU's Code of Conduct.

134.    To preside over the SRR hearing, FSU directed Winston and Plaintiff to choose one individual – from a pool of three potential hearing officers – to act as the sole officer who would decide whether any form of sexual harassment occurred.  The pool of potential hearing officers consisted of three men and no women.

135.    At the December 2, 2014 SRR hearing, Winston, Casher and Darby all refused to be questioned, except that, when asked by the hearing officer what Plaintiff supposedly said and did to express her consent, Winston gave a minimal and nonsensical answer: "moaning."  Nevertheless, in his ruling on December 21, 2014, the hearing officer determined that no account of the evening was proven by a preponderance of the evidence and as such there would be no consequences for Winston.  In essence, after reviewing over 1,000 pages of information and hearing two days of testimony, the hearing officer decided that no determination could be made one way or the other.

136.    The hearing contravened the standards and requirements of the FSU Student Conduct Code by deliberately not employing its definition of consent, by failing to weigh evidence, and by ignoring the preponderance of the evidence.

137.    Simultaneously with the issuance of the ruling on December 21, 2014, FSU's President John Thrasher issued a statement praising both the process and the result, effectively rendering meaningless Plaintiff's appeal rights under FSU's Code of Conduct.

138.    Any such appeal would be heard by an employee of FSU whose position at the school would necessarily be under the President.

139.    The ruling ten (10) days before FSU's college football playoff game against Oregon triggered another wave of electronic invective against Plaintiff, including threats of bodily harm to her person that triggered law enforcement intervention.

140.    Plaintiff's inability to attend classes at FSU in favor of men's athletics is exactly the result that Title IX was designed to prevent.

## COUNT I
### Violation of Title IX – 20 U.S.C. § 1681(a)
### (Clearly Unreasonable Response)

141.    Plaintiff re-alleges and incorporates the allegations set forth above in Paragraphs 1 – 140 as though fully set forth herein.

142.    Defendant FSU had actual knowledge of Plaintiff's sexual harassment and discrimination at the hands of Winston and his associates and supporters.

143.    FSU's responses to the harassment were clearly unreasonable in light of the known circumstances.

144.    The discrimination, consisting of Winston's rape of Plaintiff, the risks to Plaintiff's safety, the loss of her ability to continue attending FSU, and the retaliatory threats

against her, was so severe, pervasive, and objectively offensive that it barred Plaintiff's access to educational opportunities and benefits.

145.    Plaintiff was subjected to the discrimination because of FSU's deliberate indifference to known acts of harassment, sexual violence, discrimination and retaliation, including, without limitation:

    (a)    FSU's deliberate decision not to investigate and address Winston's rape of Plaintiff for close to two years so that Winston's college football career would be unaffected;

    (b)    The deliberate decisions of the FSU Police, FSU Athletics Department and other FSU officials – all of whom had authority to take corrective action under Title IX – not to report the rape to FSU's Title IX Coordinator and SRR Office so that Winston's college football career would be unaffected;

    (c)    FSU's deliberate decision to hinder the Tallahassee Police and university investigations of Plaintiff's rape so that Winston's FSU football career would be unaffected;

    (d)    FSU's deliberate decision not to provide Plaintiff with safety measures and accommodations so that she could safely pursue her studies;

    (e)    FSU's deliberate decision not to contact Plaintiff for almost one year except for advocate Pruett's confidential emotional support;

    (f)    FSU's deliberate decisions not to comply with its own policies on Sexual Misconduct, Title IX and sexual harassment, as well as the legal requirements of Title IX as set forth in the OCR's 2001 Guidance and the DCL;

    (g)    FSU's deliberate coordination with Tallahassee Police, Winston and Jansen;

    (h)    FSU's deliberate decisions to do nothing to eliminate the sexual assault risk posed by Winston, prevent its recurrence and address its effects, so that Winston's football career would be unaffected;

    (i)    FSU's deliberate decisions to twice terminate the SRR Code of Conduct proceedings to which Plaintiff had agreed; and

(j)     FSU's non-compliance at Winston's SRR hearing with its own standards, definition of consent and required weighing of the evidence, which left Winston undisciplined and playing football and Plaintiff permanently unable to return to FSU.

146.   Had FSU not been deliberately indifferent to Plaintiff's harassment, discrimination and retaliation, and instead complied with its own policies and federal law by promptly investigating Plaintiff's rape and sanctioning Winston while protecting Plaintiff's safety, Winston would have been removed as a threat to Plaintiff long before ever suiting up to play football in a Seminoles jersey, and Plaintiff would be on campus progressing toward an FSU degree.  Instead, Plaintiff was forced to leave campus while Winston remains, having suffered no consequences.

147.   Because of FSU's deliberate indifference, Plaintiff has suffered losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to: emotional distress, fear, anxiety and trauma; lost future earnings and earning capacity; and damage to and delays in her pursuit of higher education.

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendant The Florida State University Board of Trustees awarding:

(a)     Damages in amounts to be established at trial, including, without limitation, reimbursement and prepayment for all of Plaintiff's tuition and related expenses; payment of Plaintiff's expenses incurred as a consequence of the sexual assault; damages for deprivation of equal access to the educational benefits and opportunities provided by FSU; and damages for past, present and future emotional pain and suffering, ongoing and severe mental anguish, loss of past, present and future enjoyment of life, and past and present lost earnings and earning capacity;

(b)     Injunctive relief to be determined at trial requiring FSU to comply with federal law under Title IX;

(c)     Pre- and post-judgment interest;

(d)     Costs;

(e)     Attorneys' fees pursuant to 42 U.S.C. § 1988(b); and

(f)     Such other and further relief as the Court may deem just and proper.

## COUNT II
### Violation of Title IX – 20 U.S.C. § 1681(a)
### (Hostile Educational Environment)

148.   Plaintiff re-alleges and incorporates the allegations set forth above in Paragraphs 1 – 140 as though fully set forth herein.

149.   Plaintiff was subjected to physical sexual harassment, sexual assaults, sexual discrimination and retaliation that were so severe, pervasive and objectively offensive that she was denied access to educational opportunities and benefits.

150.   For Plaintiff, FSU became a sexually hostile environment where her rapist roamed free and could turn up at any moment, where she became the target of death threats and vilification campaigns, and where her rapist could act with such impunity that he posted a video of himself boasting of rape and stood shouting obscene sexual acts.

151.   FSU was deliberately indifferent to Plaintiff's known sexual harassment and the sexually hostile education environment in which she suffered as a result of its failure to institute any accommodations for Plaintiff's safety, including, but not limited to: (i) excluding her assailant from campus; (ii) providing an escort for Plaintiff around campus; (iii) requiring that her assailant not come within a certain distance of her; or (iv) excluding her assailant from her residence hall and classrooms.

152.    As a result of FSU's deliberate indifference, Plaintiff was forced to leave campus and lost her educational opportunities at the university.

153.    Because of the ongoing sexually hostile environment that FSU deliberately failed to address, Plaintiff suffered losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to: lost future earnings and loss of earning capacity; damage to and delays in her pursuit of higher education; and fear, anxiety, trauma and emotional distress.

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendant The Florida State University Board of Trustees awarding:

(a)    Damages in amounts to be established at trial, including, without limitation, reimbursement and prepayment for all of Plaintiff's tuition and related expenses; payment of Plaintiff's expenses incurred as a consequence of the sexual assault; damages for deprivation of equal access to the educational benefits and opportunities provided by FSU; and damages for past, present and future emotional pain and suffering, ongoing and severe mental anguish, loss of past, present and future enjoyment of life, and past and present lost earnings and earning capacity;

(b)    Injunctive relief to be determined at trial requiring FSU to comply with federal law under Title IX;

(c)    Pre- and post-judgment interest;

(d)    Costs;

(e)    Attorneys' fees pursuant to 42 U.S.C. § 1988(b); and

(f)    Such other and further relief as the Court may deem just and proper.

-34-

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury as to all matters so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  January 7, 2015.

Respectfully submitted,

/s/ David B. King
David B. King
Florida Bar No.: 0093426
Thomas A. Zehnder
Florida Bar No.: 0063274
Taylor F. Ford
Florida Bar No.: 0041008
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone:  (407) 422-2472
Facsimile:  (407) 648-0161
Email:  dking@kbzwlaw.com
Email:  tzehnder@kbzwlaw.com
Email:  tford@kbzwlaw.com

Baine Kerr (Colorado Bar No.:  9797)[*]
John Clune (Colorado Bar No.:  27684)[*]
Lauren E. Groth (Colorado Bar No.:  47413)[*]
HUTCHINSON BLACK AND COOK, LLC
921 Walnut Street, Suite 200
Boulder, CO  80302
Telephone:  (303) 442-6514
Facsimile:  (303) 442-6593
Email: kerr@hbcboulder.com
Email: clune@hbcboulder.com
Email: groth@hbcboulder.com

*(Motions to appear pro hac vice forthcoming)*

*Counsel for Plaintiff*